IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| LESLIE MITCHELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civ. No.: _____ |
| v. | § | Judge: _____ |
| | § | |
| INFORMATION INTERNATIONAL | § | |
| ASSOCIATES, INC., | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendant. | § | |

## COMPLAINT

Plaintiff, Leslie Mitchell, files this Original Complaint pursuant to the anti-retaliation provisions of the False Claims Act, 31 U.S.C § 3730(h), and would respectfully show the Court as follows:

### I.    PARTIES

1.    Plaintiff, Leslie Mitchell ("Plaintiff" or "Mitchell") is a resident of the State of Texas and resides in Tarrant County.

2.    Defendant, Information International Associates, Inc. ("Defendant" or "IIA") is a private corporation organized under the laws of the State of Tennessee, with its principal place of business, corporate headquarters, and registered agent address for service of process, at 104 Union Valley Road, Oak Ridge, Anderson County, Tennessee 37830.

### II.    JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3730(h).

4.    Venue is proper in the Eastern District of Tennessee, pursuant to 31 U.S.C. § 3732(a), as the Defendant resides and transacts business in this judicial district. Defendant's

corporate functions, including finance, accounting, contract management, human resources, information technology, project controls, security, and business development are performed out of Defendant's Oak Ridge, Tennessee office location.

## III. FACTUAL ALLEGATIONS

### A. Plaintiff's Employment with Defendant

5.     Tennessee resident Bonnie Carroll ("Carroll") founded IIA in 1988.  IIA provides "Enterprise IT & Data Management, Advance Data Analytics, Intelligence Data Exploitation, Cyber Security & Threat Intelligence, and Engineering, Science, & Technology" services to "government agencies with data-intensive missions."[1]

6.     Plaintiff is a career Intelligence Officer who has served with distinction in both the U.S. Army and U.S. Air Force for more than twenty (20) years.  With a background in Political Science and Russian and Soviet Studies, she was previously assigned to the Office of the Secretary of Defense, Air Combat Command, North American Defense Command, US Northern Command, Foreign Military Studies Office, and the 6th Infantry Division.  She is a recognized Open Source Intelligence ("OSINT") subject matter expert and has been requested by name to support the Department of Defense and Intelligence community in developing intelligence strategy and policy. Plaintiff has a Top Secret/Sensitive Compartmented Information ("SCI") with a Counterintelligence polygraph personal security clearance that is subject to reinvestigation and renewal every five (5) years.

7.     Plaintiff worked for Defendant for nearly twelve (12) years, from May 2007 to January 2019.  During the term of her employment, Plaintiff worked for Defendant from a home

---

[1] "About." *Information International Associates*, iiaweb.com/about. (last accessed March 1, 2021).

office and regularly traveled to the corporate office in Oak Ridge, Tennessee, and to government customer sites throughout the country.

8.      Carroll sold IIA in March 2018 to Jeanette Lee ("Lee") and a group of investors. Lee then became IIA's Chief Executive Officer.

9.      Plaintiff last held the position of Vice President of Intelligence. Lee was Plaintiff's direct supervisor. Plaintiff has extensive experience supporting the intelligence analysis efforts of critical communication networks and systems and performing threat and risk assessments of national and international command, control, communication, computer, intelligence, and electronic warfare networks. Plaintiff was responsible for the management and business development of IIA's Intelligence Service business unit, serving across dispersed locations. Plaintiff was responsible for personnel management, business development, marketing, capture, proposal development, and alliances to support the company's growth plans.

**B. Plaintiff's Report of Fraud in Connection with Defendant's Bid for a Government Contract**

10.     On November 9, 2018, Defendant received a Request for Proposal ("RFP") for information technology services for the U.S. Army Center for Military History ("CMH").

11.     Due to the complexity and technical skill required by the project, contractors, such as IIA, who wished to submit a response to the RFP were required to provide Letters of Commitment for six (6) "Key Personnel" that were needed for the project. The Key Personnel described in the RFP were technical individuals with unique and specific specialized skills, qualifications, and security clearances. The number of individuals in the labor force that could satisfy these specifications was exceptionally small. Because of this, Letters of Commitment from these individuals indicating their availability were required with all RFP responses.

12.     Section L.7.2 of the RFP provided that "[a]ll Key Personnel proposed shall be

named in the Project Staffing Plan Table and available to begin work immediately on the project start date." This section also described the contents of the Letters of Commitment. Specifically, contractors were required to provide along with their responses:

> . . . a one page Letter of Commitment for each Key individual, stating the Key Person's commitment and availability to perform work at the project start date, **signed by each proposed Key Person (a Pass/Fail requirement) at the proposal submission due date.** The Letter shall state that (1) the proposed Key Person named is employed by the Prime offeror, JV Team Member, or subcontractor, or has an offer of employment from the specified Prime offeror, JV Team Member, or subcontractor that the Key Person intends to accept in the event of an award being made to the offeror; (2) the proposed Key Person is available and committed to begin work on the Project Start Date . . . . The signed Letter of Commitment shall also include a statement regarding the current level of personnel Security Clearance Level of the Key Individual, which shall serve as the individual's security level self-certification for Government evaluation purposes. (emphasis added).

13.    At all times material hereto, the Key Personnel described herein are material conditions of the RFP, such that the failure to comply with same would result in the government rejecting Defendant's RFP.

14.    At all times material hereto, the Letters of Commitment described herein are material conditions of the RFP, such that the failure to comply with same would result in the government rejecting Defendant's RFP.

15.    Section L.8 of the RFP provided "Pass/Fail Elements" for proposals. This section stated that "[a] failure on any single Pass/Fail criteria will make the proposal ineligible for award, with no further evaluation of the Technical and Cost/Price proposal accomplished by the Government." Of the criteria specified, this section explicitly required the name of each proposed Key Person and a signed Letter of Commitment from each proposed Key Person to be submitted along with all contractor responses by the due date. This section also expressly stated that "[a]

proposal that states, 'To Be Determined' (TBD) for a proposed Key Person, or omits a required Key Person position, will be rejected by the government."

16.     Further, Section M of the RFP listed "Evaluation Factors" to be considered prior to awarding the contract.  Section M.4 reiterated that the Pass/Fail Elements *must* be satisfied and that "[a] failure on any single Pass/Fail criteria on its initial proposal will make the entire proposal ineligible for award, with no further evaluation of the technical and pricing proposal accomplished by the Government." This Section further expounded upon the Key Personnel requirements:

> a. The Government will reject any proposal that does not provide a name for each Key Person proposed at the proposal submission due date/time.  A proposal that states in the Project Staffing Plan Table, 'To Be Determined' or TBD for a proposed Key Person, or omits a required Key Personnel position, will be rejected by the Government.
>
> b. The Government will reject any proposal that does not provide a completed Letter of Commitment, signed by each proposed Key Person at the proposal submission due date/time.  To meet this Pass/Fail criterion, the letter shall be signed by the proposed Key Person . . . .

17.     At all times material hereto, knowingly providing false information in an RFP to CMH would be in violation of federal law, including the False Claims Act, 31 U.S.C. § 3729, *et seq*.

18.     At all times material hereto, knowingly providing forged and/or fraudulent information in an RFP to CMH would be in violation of federal law, including the False Claims Act, 31 U.S.C. § 3729, *et seq*.

19.     At all times material hereto, knowingly providing false information in an RFP would subject Defendant and/or the responsible employees to civil penalties.

20.     At all times material hereto, knowingly providing false information in an RFP would subject Defendant and/or the responsible employees to criminal penalties.

21.     The period of performance under the RFP was listed as a one-year base period and four, one-year option periods, with a start date of February 1, 2019.  Estimated price ranges for each of the five one-year periods were listed as $5.8-6.8MM each.

22.     If Defendant's RFP was selected, then Defendant would have obtained a multi-million dollar contract funded by the federal government.

23.     The due date for submission of RFP responses by participating contractors was set for Monday, December 10, 2018, at 12:00 PM PST.  Under Section L.6, the RFP provided that "[a]ny files not received by the cut-off date and time specified herein shall be deemed late and not considered for evaluation purposes."

24.     In response to the RFP, Defendant began searching for individuals qualified to fill the Key Personnel positions identified by the RFP for its proposal.  A new employee, Jerry Evans ("Evans"), was assigned responsibility for filling these positions. Evans was assisted by an independent recruiting contractor, Bob Vargas ("Vargas"), to aid in locating qualified resources.

25.     Evans was still searching for a resource to fill one of the Key Personnel positions as late as Friday, December 7, 2018, three (3) days before the due date to submit proposals for the RFP.  On this date, Vargas emailed Evans at 1:19 pm to advise that he had a "nice chat" with an individual, Ramakrishna Chary ("Chary"), that Vargas identified to fill one of the Key Personnel roles.  Vargas advised that Chary was "looking at the job summary and scope" and that Vargas had requested that Chary get back to him "this afternoon if possible." Vargas indicated he would call Evans "in a few." Evans responded, stating, "let's try to lock him down, and if needed, I can talk to him as soon as you are done confirming his interest."

26.     Plaintiff assisted Evans on the proposal as she had many years of experience in responding to RFPs.  On Saturday, December 8, 2018, Plaintiff received a phone call from

6

Evans. Plaintiff believed Evans to be apprehensive, and he stated that he had not been able to obtain a commitment from the last-needed Key Person in time to meet the submission due date. Evans told Plaintiff that he was unable to contact Chary, did not have Chary's agreement to work for Defendant on this contract, and did not have Chary's signed Letter of Commitment. Evans stated that he signed Chary's name on the Letter of Commitment.

27.     Evans' conduct described above constitutes a false and fraudulent forgery of the RFP submitted to CMH.

28.     Evans' conduct described above is a violation of federal law, including the False Claims Act, 31 U.S.C. § 3729, *et seq*.

29.     As a result, Plaintiff immediately told Evans that what he was doing was illegal, as it was a requirement that Key Personnel personally sign the Letters of Commitment themselves. Without it, it was patently clear that Defendant's proposal could not be considered. Even a verbal commitment from Chary, assuming Defendant had it, was insufficient under the explicit terms of the RFP. However, Evans was not concerned by Plaintiff's objections. In fact, Evans stated that he had "done this before," meaning he had forged documents previously while employed by other companies and did not indicate that he was going to attempt to procure Chary's signature on the Letter of Commitment.

30.     On Monday, December 10, 2018, the due date for RFP response, Evans emailed Defendant's employees engaged on the RFP to advise that the proposal had been submitted. Evans also thanked them for their support in helping him complete his first RFP proposal with Defendant, and stated, "[a]s you know, the Staffing and BOE [Basis of Estimate] did not come together until the very end, and it took a few iterations to make sure we could come in within the target range that the Government provided with the appropriate number of staff and skills set to

show we knew how to do this job."

31.    As of December 10, 2018, Plaintiff was considered part of Evans' team responsible for submitting the RFP response. Plaintiff made substantial contributions to the response and was responsible for pulling together team members, coordinating workshare among the team, introducing Evans to appropriate IIA personnel to develop the technical response, developing sections of the RFP response, including the solution, technical approach, and past performance sections, and reviewing/editing the proposal.

32.    Defendant's proposal included a Letter of Commitment allegedly provided by Chary. The letter was dated Friday, December 7, 2018, and contained a physical signature. The presence of a physical signature confirmed for Plaintiff that Evans had, in fact, forged Chary's signature and dated the document so that it appeared to be in compliance with explicit RFP requirements.

33.    Plaintiff was troubled by Evans' conduct and admission and realized that if Defendant was awarded the contract, it would have procured that contract by committing fraud.

34.    At all times material hereto, Defendant's Code of Business Ethics and Conduct provided, in relevant part:

> Being a Government contractor involves a unique set of risks and responsibilities. We expect greater scrutiny regarding our recordkeeping, especially with regard to representations we make to the Government. We must always be scrupulously careful about the administration and delivery of our services. We must, at all times, comply with all relevant laws, regulations, and contracts. **It is a criminal offense to knowingly make a false claim or false statement to the Government.** (emphasis added).

35.    As Plaintiff worked with Evans on the proposal and had personal knowledge of his forgery before it was submitted to the government, Plaintiff feared that she could have been held liable as an accomplice and/or accessory to Evans' criminal conduct.

36.     Plaintiff feared that her silence and failure to stop Evans' conduct could expose her to personal criminal and civil liability.

37.     Recognizing what Plaintiff perceived as a legal and ethical obligation to report the fraud, Plaintiff emailed the CEO, Lee, on December 20, 2018, to report Evans' conduct, and stated:

> Jeanette, On December 8 and again on December 10, Jerry told me that he forged the signature of a candidate on the letter of commitment that was submitted on the Army CMH proposal. He said that "I could not get a hold of the candidate and needed his resume, so I just signed the signature of the letter of commitment." I have notified Jerry and informed him that this is a fraudulent, misrepresentation on a government contract and he must notify you immediately. IIA has an obligation to correct and report this to the government. I want no part of any civil, criminal misrepresentation to the government.

38.     Lee responded a few hours later, copying Defendant's Chief Operating Officer, Michael Agrillo ("Agrillo"), and stated, "Ok when I return I will probe further and come up with a proper remedy."

39.     Also, on December 20, 2018, Plaintiff emailed Evans and stated:

> Jerry, On December 8 and again on December 10, you told me that you forged the signature of a candidate on the letter of commitment that was submitted on the Army CMH proposal. You said that you "could not get a hold of the candidate and needed his resume, so you just signed his signature to the letter of commitment." This is a fraudulent, misrepresentation of a government contract. You must notify Jeanette immediately. I will be notifying her. IIA has an obligation to correct and report this to the government. Jerry, I want no part of any civil, criminal misrepresentation to the government.

40.     Evans did not reply to Plaintiff's December 20, 2018 email.

41.     Three (3) hours after her initial response to Plaintiff's email, Lee emailed Plaintiff again and stated:

> I was able to connect with Jerry tonight. Connection had a lot of static but I think I got most of it: It turns out that the candidate had clearly told Bob [Vargas] to use his resume and represent accordingly on his behalf (ie [sic] present him in the bid as a contingent-hire).  He will make sure to get this fully acknowledged in writing

from the candidate and also to specifically acknowledge that Jerry has properly represented him by signing the letter on his behalf. This then would verify (and actually certify) that Jerry's representation of this candidate's contingent-hire to the government to be completely valid, as that, in fact, was the true intent of this candidate. I will run this by our counsel just to be triple sure. I thank you, Leslie, for raising your concern.

42. Subsequently, Lee did not provide Plaintiff with a statement from Chary indicating his intent and permission for Evans to sign the Letter of Commitment on his behalf. Lee also did not provide Plaintiff with any confirmation that Defendant's counsel confirmed that Evans' conduct was in fact permissible.

43. However, even if Chary had provided the statement contemplated by Lee, Defendant's proposal could not be accepted by the Government as it did not satisfy the explicit RFP requirements.

44. Plaintiff's December 20, 2018 email to Lee explicitly asserted that Evans had committed a "fraudulent misrepresentation on a government contract" and a "civil, criminal misrepresentation to the government." Plaintiff advised Lee of IIA's obligation to correct this misinformation. Combined with Evans' same-day *admission* to Lee to signing Chary's name on the Letter of Commitment, Plaintiff's report unquestionably provided Defendant with credible evidence that fraud was committed in connection with a government contract bid, and that IIA and/or its employees could have criminal and civil exposure for submitting a false claim to the government.

45. Upon information and belief, Defendant never disclosed Evans' fraud to the government.

46. Upon information and belief, Defendant never reported the concerns set forth in Plaintiff's December 20, 2018 email to the government.

47.     Instead, Lee, Agrillo, and Evans conspired to cover-up the forgery by claiming Evans had Chary's permission to sign his name on the Letter of Commitment.  This justification directly conflicts with what Evans reported to Plaintiff on December 8, 2018, and again on December 10, 2018, that Evans could not get ahold of Chary, so he "just signed his signature to the Letter of Commitment."

48.     Although Defendant's Code of Business Ethics and Conduct explicitly required Plaintiff to report what Evans had done, and promised that "all issues of importance to the company can be freely discussed without fear of retaliation," Lee thereafter retaliated against Plaintiff for her report of the fraud in connection with Defendant's government contract bid.

**C.  Defendant Retaliates Against Plaintiff**

49.     Plaintiff had a well-documented, positive performance record while employed with Defendant.

50.     Throughout her employment, Plaintiff earned positive performance evaluations.

51.     Throughout her employment, Plaintiff earned several merit raises and bonuses.

52.     Plaintiff's performance entitled her to many raises and bonus payments for "excellent performance."

53.     In April 2018, Plaintiff received a $210,000 bonus for growing Defendant's Department of Defense and Intelligence business.

54.     On July 17, 2017, a company-wide email was circulated announcing that Defendant's NGA CAT Team won two (2) new Core Analysis Tasks for research and development.  Plaintiff developed this classified contract opportunity, subsequently won seven (7) task orders, and was Defendant's executive lead for the NGA CAT Team.

55.     On July 24, 2017, a company-wide email was circulated announcing that a wholly-owned subsidiary of Defendant was awarded a three (3) year contract to provide information technology support at Fort Leavenworth.  Plaintiff developed and secured this classified contract, and her name and photograph were published in the email announcement.

56.     On November 13, 2017, a company-wide email was circulated announcing that Defendant was awarded the "Defense Information Systems Agency Encore III IDIQ."  Plaintiff secured this contract, and her name and photograph were published in the email announcement.

57.     On October 8, 2018, a company-wide email was circulated announcing that Defendant was awarded a contract to provide services for the Chemical, Biological, Radiological, and Nuclear Office.  Plaintiff secured this classified contract, and her name and photograph were published in the email announcement.

58.     Plaintiff was responsible for business development, and she captured and served as the proposal lead and single point of contact for each of the notable contract awards prominently featured on Defendant's website *as of the date of this filing*.[2]

59.     On November 30, 2018, Plaintiff was advised by Defendant's Human Resources Department that annual performance reviews would be conducted in a different manner than in years past.  Instead of having an employee complete a self-assessment, which had been Defendant's standard method of review, the employee's supervisor would complete the assessment, provide it to the employee, meet with the employee to discuss, and then return the completed and discussed assessment to Human Resources. The performance reviews were scheduled to be completed, discussed, and returned to Human Resources by December 15, 2018.

---

[2] Notable contracts include CASES II (Director of National Intelligence), INSCOM GISS (Army), DISA Encore III and ITES 3S (Defense Information Systems Agency), DIA ESITE and SIA 2 (Defense Intelligence Agency), and J8 CBRN Defense (Joint Requirements Office). "Contract Vehicles." *Information International Associates*, iiaweb.com/contract-vehicles (last accessed March 1, 2021).

As Plaintiff's direct supervisor, Lee was responsible for evaluating Plaintiff's performance and conducting her performance review.

60.     On December 26, 2018, just six (6) days after Plaintiff reported Evans' fraudulent conduct, Lee *belatedly* provided Plaintiff with a copy of her Performance Review via email.  In the email, Lee claimed that "a lot" of the items noted in the review had already been discussed with Plaintiff in previous conversations, but this was not true or accurate.

61.     The 2018 Performance Review contained six assessment categories applicable to Plaintiff.    Assessment categories could be marked as "Exceeds Expectations," "Above Expectations," "Meets Expectations," or "Does not Meet Expectations." The review form notes that "few employees" would fall into the "Does not Meet Expectations" category while the "majority of employees" would fall into the "Meets Expectations" category.

62.     For the assessment category "Knowledge of Work/Proficiency: Consider the quality, quantity, results, and impact of the employee's knowledge and ability to accomplish tasks," Lee adjudged Plaintiff "Does not Meet Expectations" and commented:

> Leslie needs to improve in certain areas needed to be a successful results-driven VP-level contributor…the very basic functions and esp the level-of-output (i.e. both results and productivity) expected of a VP of BD in a highly competitive environment, all fall below expectation[.] I have held several discussions with Leslie on this since June 2018 and have not seen marked improvement in either output much less actual results, even despite extra cash incentives I had discussed with her, designed to motivate and be tied to filling IC open reqs as her primary focus while providing other forms of BD support…Leslie needs to improve on sharpening her focus significantly increasing her sense of urgency for the Company…doubling her daily output…be far more diligent on leads follow-up's…Leslie requires more hand-holding and management time typically required for a VP-BD level at her salary level.

63.     For the assessment category "Initiative/Motivation: Describes the degree of willingness to execute duties, motivate colleagues, and develop innovative new processes," Lee adjudged Plaintiff "Does not Meet Expectations – lacked motivation and did not display

initiative." Lee referred to the comments stated in the above Paragraph as justification for this assessment.

64. For the assessment category "Resource utilization: (*e.g.*, time management, equipment, manpower and budget): Consider how effectively the employee utilizes resources to accomplish IIa's goals/needs," Lee adjudged Plaintiff "Does not Meet Expectations – Improperly or inconsistently managed time and other resources." Lee commented, "need to see far better time management, some better structure in her work and her workflow, and make concerted effort to minimize re-hashing/re-discussing the same stuff over and over again..and be mindful of other exec's time (being very costly to the Company)."

65. For the assessment category "Goal Accomplishment: Consider the employee's ability to lead and produce timely, high quality/quantity, IIa-focused results," Lee adjudged Plaintiff as "Does not Meet Expectations – Displayed little competence to complete task."

66. Plaintiff responded to Lee's e-mail and criticisms, stating, "I am shocked and confused by this evaluation and would like to discuss in person with you, so we can correct the wrong that is being done."

67. Lee replied to Plaintiff, doubling down on her false assertion that the criticisms in Plaintiff's performance review were previously discussed with Plaintiff and that she had talked to Plaintiff about a "lack of results" on several occasions.

68. Plaintiff and Lee had weekly calls beginning in June 2018. However, the purpose of those calls was never to, nor did it involve a critique of Plaintiff's performance. Rather, Plaintiff provided education and support to Lee, who was new to the company, on Defendant's capabilities and customers. In addition to discussing Defendant's corporate capabilities and historical information on customers and agencies that Defendant supported, Plaintiff educated

Lee on Defendant's current contracts, contracts pursued, and contracts previously won. Plaintiff also apprised Lee of Plaintiff's current projects and pursuits.

69.     Plaintiff frequently communicated with Lee and Defendant's Chief Strategy Officer, Ron Jones ("Jones"), regarding Defendant's capabilities, knowledge of IIA contracts, and relationships with Department of Defense and Intelligence customers. Jones and Lee repeatedly relied on Plaintiff's knowledge, thanked her for sharing this knowledge, and stated that Plaintiff was a key member of their team and an integral part of the "plan" for Defendant going forward.

70.     It was during these weekly calls beginning in May 2018 forward, that Lee informed Plaintiff that Lee wanted to build a new company and leverage Plaintiff's OSINT expertise and the company's rich heritage in OSINT. Plaintiff was asked to attend meetings with potential companies that Lee was interested in purchasing. During these meetings, Lee frequently highlighted Plaintiff's tenure with Defendant to showcase to the potential sellers that Defendant was a great company to work for and that they valued their employees.

71.     Regarding Lee's complaint that Plaintiff failed to fill "open reqs" (requisitions), Lee had promised to provide Plaintiff with a dedicated, full-time intelligence recruiter to support Plaintiff's objective in filling open positions, as Lee recognized that recruiting activities were time-consuming. In fact, Lee had commended Plaintiff for her past work in finding opportunities, winning contracts, staffing contracts, and managing the programs. However, Lee terminated the Vice President of Recruiting around September 2018, without notifying Plaintiff or other staff. At the time Lee terminated the Vice President of Recruiting, Plaintiff was attempting to staff a large contract with immediate hire needs. When Lee agreed to hire Bob Vargas, a temporary

recruiter, in the fall of 2018, Lee instructed Plaintiff not to distract him with Plaintiff's open requisitions because he was working on other priorities.

72.     During the performance review period for 2018, Plaintiff demonstrated the same motivation and competence that she had been consistently recognized for throughout her career with Defendant, and Plaintiff's 2018 accomplishments included but were not limited to:

a.  Plaintiff procured two (2) contract task order awards totaling $1 million to support the National Geospatial-Intelligence Agency, CAPES, Voice of the Customer initiative.

b.  She was also responsible for obtaining the only Department of Defense classified contract under the GSA Alliant Small Business vehicle, the Training Management Directorate, Information Technology ("TMD IT") contract at Fort Leavenworth. The TMD IT contract strategically positioned Defendant to pursue potential follow-on task orders supporting NGA under the GSA Alliant Small Business contract vehicle.

c.  Plaintiff obtained the JRO J8 Chemical, Biological, Radiological, and Nuclear Defense Studies and Analysis contract, which was valued at $28 million.

d.  Plaintiff had won seven task orders under the HDIAC contract that carried a value of $3.5 million.

73.     Plaintiff was responsible for all business development, capture, operations, and program management of the task order contracts.  Plaintiff oversaw five (5) direct reports as well as customer engagement.  Plaintiff successfully managed, operated, and closed out these classified contracts to include preparing the final technical reports for each task and exceeded profit goals for each task.

74.     Plaintiff alone garnered the largest amount of revenue for Defendant under the HDIAC contract and was the only individual to obtain *new* business for Defendant in the last

four (4) years of her employment. The number of task orders Plaintiff won represented more than 50% of the overall task order dollars won on the HDIAC contract.

75. Lee also expressed great interest in having Plaintiff leverage her relationships and OSINT subject matter expertise to get more work with the intelligence community. Plaintiff worked on creating the first new IIA website that was on the internet after Lee acquired the company. The website showcased Defendant's four (4) areas of expertise (Threat Intelligence, OSINT, Enterprise IT, and Data Management). Plaintiff was featured on the OSINT section and also developed a "one-sheet" that Defendant could take to market to describe its capabilities.

76. In sum, Lee's criticisms of Plaintiff's performance and contributions to Defendant were trumped up and had no merit. Prior to Plaintiff's internal report of fraud in connection with a government bid, Plaintiff had never received a poor performance review or been subject to any sort of disciplinary action or negative comments on her job performance.

77. Prior to Plaintiff's report of the fraud in connection with the government bid, Plaintiff had a good working relationship with the executives and other members of management, including Lee, Jones, Evans, and Agrillo. But after Plaintiff reported the fraud, the relationships deteriorated, and Plaintiff began being treated in a cold and hostile manner, and steps were taken to isolate and marginalize Plaintiff, as Defendant was also falsely documenting Plaintiff's personnel file in an attempt to force her to quit or justify her eventual termination.

78. The litany of Plaintiff's accomplishments, awards, and recognitions that Plaintiff earned during her tenure at IIA demonstrate that the belated and incredibly negative performance review that Lee gave to Plaintiff, just six (6) days after her internal report of fraud, was done in retaliation for Plaintiff's insistence that Lee follow the law.

79.     Throughout Plaintiff's employment, Defendant used performance reviews to determine employee raises, bonuses, and promotions/title changes.

80.     Plaintiff, therefore, understood the false and trumped-up poor performance evaluation would be used to impact her pay and promotion trajectory with Defendant negatively, while also "documenting" Plaintiff's personnel file to support her eventual termination.

81.     While employed with Defendant, Plaintiff was responsible for responding to Requests for Information ("RFI") for projects requiring Intelligence expertise and involving the Department of Defense. As such, in December 2018, Plaintiff was tasked with preparing a response to an RFI for a Special Operations Command ("SOCOM") project.  However, in early January 2019, following Plaintiff's report of fraud, Lee removed Plaintiff from that task and re-assigned it to a new employee that IIA had *just* hired. Lee claimed the new hire was "highly qualified" to do the work. However, this employee, by virtue of being brand new to the company, lacked an understanding of IIA's corporate history, capabilities, and experience, and was not able to respond to the RFI on his own. He frequently sought Plaintiff's assistance in responding to the RFI. When Plaintiff questioned Lee as to her reasons for reassigning this important Intelligence work to a new-hire, Lee chided Plaintiff for "challenging" her decision.

82.     At Lee's direction, Defendant also made Plaintiff's working conditions hostile and untenable. Although Plaintiff did not complain to Defendant's Chief Strategy Officer, Jones, directly about the fraud, it was clear he subsequently learned of Plaintiff's report because, in January 2019, Jones, in-person, accused Plaintiff of "stabbing IIA in the back."  Evans then threatened that, according to Lee, Plaintiff "better start looking for a job" because she was "not going to be there long." Also, Agrillo outright refused to speak with or acknowledge Plaintiff's

presence in subsequent in-person meetings and conversation, further ostracizing and isolating Plaintiff.

83.     Before December 20, 2018, Plaintiff was responsible for reviewing Intelligence companies and the Intelligence and Department of Defense business lines of companies that IIA was interested in acquiring.  Following Plaintiff's report of fraud, however, Lee removed Plaintiff from a distribution list for information concerning corporate acquisitions, thereby further isolating the Plaintiff, marginalizing the Plaintiff, while also diminishing and prohibiting Plaintiff from performing her job duties.

84.      Defendant's retaliation against Plaintiff and the promotion of a corporate culture that flouted legal and ethical requirements weighed heavily on Plaintiff, and she feared her own criminal and civil liability due to Evans' fraud and the failure of Defendant to address or correct it. Since Defendant refused to correct false statements contained within the CMH proposal, Plaintiff believed she was at risk of being implicated in Evans' fraud, thereby placing her personal security clearance and professional reputation in jeopardy.

85.     If Plaintiff was implicated in Evans' fraud, then she would be required to disclose this information in subsequent government security clearance renewal investigations and polygraph examinations. Such adverse and derogatory information could jeopardize her government security clearance, career prospects, reputation, and livelihood.

86.     Further, if Defendant fired Plaintiff based on false and trumped-up allegations, this would severely jeopardize her hard-earned career, and it would be very difficult for Plaintiff to find other employment.

87.     It also became clear to Plaintiff that the retaliatory actions being taken against her would continue and escalate, and Plaintiff would be terminated if she did not resign.

88.     On January 31, 2019, Plaintiff was constructively discharged by Defendant. Plaintiff had no other choice but to resign from her employment with Defendant.

89.     Plaintiff subsequently filed for unemployment compensation benefits, which Defendant contested.  Following an evidentiary hearing, the Texas Workforce Commission Appeal Tribunal awarded Plaintiff benefits and concluded that Plaintiff "reasonably believed that there was a reasonable chance that her professional credentials could have been adversely affected by continuing to associate with an employer that she knew had knowingly submitted a fake document to the government" and had "work-connected good cause to quit."

**D.  Defendant's Retaliation Against Other Whistleblowers**

90.     Plaintiff is not the only IIA employee to have suffered consequences as a result of reporting fraud to IIA leadership. Defendant retaliated against Deena Koper ("Koper") and Jay Campey ("Campey") as a result of their own internal reports of fraudulent activity.

91.     Koper, a thirty (30) year veteran Facility Security Officer, was hired as a contractor to advise and assist Defendant's Facility Security Officer, Kelly Callison ("Callison"), with ensuring Defendant's compliance with government security regulations and overseeing security policies and procedures.

92.     In November 2018, Koper learned that an employee executed a Security Package Submission and Certification Statement in connection with a government contract. In signing this statement, the employee certified that Defendant implemented required security controls and protection measures for computer systems that would perform work on a government contract. However, Koper learned that the security controls and protection measures were not implemented as certified, and on November 5, 2018, she reported to Callison that this employee "dishonestly certified" compliance.  Koper also expressed to Callison her concern regarding this

employee's "dishonesty as a cleared individual" and that Defendant "may be obligated to submit an adverse information report or possibility an individual culpability report."

93.     Upon information and belief, Defendant did not submit an adverse information report, individual culpability report, or discipline the employee who falsely certified compliance with system requirements.

94.     Koper's contract with Defendant was scheduled to end in early 2019. Following her report of the false certification of system compliance requirements, however, Defendant advised her that her contract would instead end that month, in November 2018. Koper's employment with Defendant ended on or about November 17, 2018. Callison reportedly told Koper that Lee "wanted her gone."

95.     In January 2019, Defendant employed Campey as a Systems Administrator for corporate back-office operations.

96.     Randy Hoffman ("Hoffman") previously worked for Defendant as the Deputy Director of the HDIAC contract. Following her departure, she continued to work in Defendant's corporate office building in Oak Ridge, Tennessee, in a space leased by her new employer, Oak Ridge Strategies Group ("ORSG").

97.     On or about January 6, 2019, Hoffman spoke with Campey about work he was allegedly performing, on behalf of Defendant, for ORSG. Campey had built a SharePoint site for ORSG six (6) months prior. Confused, Campey advised Hoffman that he had not performed any services for that ORSG contract in many months. Hoffman advised that ORSG continued to receive monthly billing from Defendant for Campey's services. Campey advised Hoffman that he had not performed any billable work for ORSG and would look into it.

98. Campey reported suspected fraudulent billing to Defendant's Project Controls Office employees, Elizabeth Kendall ("Kendall") and Stephanie Casatis ("Casatis"), and asked questions about how Defendant was billing this particular client. Upon information and belief, Kendall and Casatis then reported Campey's concerns to Agrillo.

99. Following Campey's report of fraudulent billing, Agrillo falsely accused Campey of "client stealing." He was placed on administrative leave on or about January 8, 2019. He was threatened with termination and forced to resign on January 14, 2019. Defendant offered Campey the opportunity to sign a Non-Disclosure Agreement in exchange for two (2) weeks' severance, but he declined the offer and subsequently communicated this information to Plaintiff.

100. At the time Plaintiff was forced to resign in January 2019, Plaintiff was well-aware of Defendant's retaliatory conduct against Campey.

## IV.   CAUSE OF ACTION

### Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h)

101. Plaintiff incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

102. Plaintiff, an employee of Defendant, falls within the scope of the False Claims Act's protection.

103. Without Chary's signature on his Letter of Commitment, Defendant would have been automatically disqualified from consideration for the CMH contract award. Defendant submitted the bid for the federal government contract using falsified documentation. Plaintiff attempted to prevent harm to the government by reporting Evans' fraudulent conduct to her supervisor, Lee. Plaintiff explicitly advised of a "fraudulent misrepresentation" on a government contract and noted the possibility of civil and criminal liability.

104.     Plaintiff's reports and attempts to stop and/or rectify violations of the False Claims Act, as alleged herein, constitute protected activity under the False Claims Act, 31 U.S.C. § 3729, *et seq*.

105.     Plaintiff's supervisor, Lee, retaliated against her, including but not limited to, by authoring a humiliating and undeserved performance review, reassigning Plaintiff's projects to a less-qualified employee, denying her information required to perform corporate acquisition tasks, fostering a hostile work environment, gossiping about her, and constructively terminating Plaintiff.  Lee's conduct deliberately made Plaintiff's working conditions so intolerable that a reasonable person in Plaintiff's position would have resigned.

106.     The CEO, Lee, retaliated against Plaintiff for no reason other than Plaintiff's engagement in protected activity.  Lee's stated reasons for criticizing Plaintiff, including via the negative performance review, are a pretext for unlawful retaliation.

107.     Prior to Plaintiff's termination, the CEO, Lee, was aware of and/or had knowledge that Plaintiff had complained about fraudulent misrepresentations made to the federal government.

108.     As a result of Defendant's retaliation against Plaintiff, Plaintiff has and will continue to suffer damages including but not limited to a prior and future loss of income and benefits, as well as mental anguish, emotional distress, humiliation, and embarrassment.

109.     This suit is timely filed.

## V.     JURY DEMAND

110.     Plaintiff hereby demands a trial by jury on all issues so triable.

## VI.     PRAYER FOR RELIEF

111.     Plaintiff prays that judgment be entered in Plaintiff's favor, awarding Plaintiff,

a. Compensatory damages, including back pay and front pay (or, in the alternative, reinstatement if the Court deems it appropriate);

b. Two times the amount of Plaintiff's back pay, with interest;

c. Compensation for special damages, including mental anguish and emotional distress;

d. Prejudgment interest;

e. Reasonable attorney fees and costs;

f. A jury to try this cause; and

g. Such other and further relief, general or special, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

s/D. Alexander Burkhalter, III
David A. Burkhalter, II, TN BPR #004771
D. Alexander Burkhalter, III, TN BPR #033642
Zachary J. Burkhalter, TN BPR #035956
The Burkhalter Law Firm, P.C.
111 S. Central Street
P.O. Box 2777
Knoxville, Tennessee 37901-2777
(865) 524-4974


/s/ Justin Sumner
Justin Sumner**
Texas Bar No. 24063022
E-Mail: jsumner@sumnerschick.com

Sumner Schick, LLP
3006 Cole Avenue
Dallas, Texas 75219
(214) 965-9229

ATTORNEYS FOR PLAINTIFF

**Pro hac vice motion to be submitted